124-1384 W.C. City of Chicago Appellant by Joseph Zwick v. Illinois Workers' Compensation Comm'n et al., Veronica Farmer, Appali by Cameron Clark. Mr. Zwick, you may proceed. Thank you, Your Honor. Good afternoon, Your Honors. Counsel, may it please the Court, Joseph Zwick on behalf of the City of Chicago, the Plaintiff Appellant in this case. Your Honors, the City does maintain that the Commission erred in many aspects of this claim with respect to finding permanent restrictions in the extent of the disability. However, for purposes of the review before Your Honors, we realize that the Commission has the right to make findings of fact, and they chose to accept the restrictions of permanent sedentary employment with no directing traffic. And so, for purposes of our discussion, we're going to accept those facts as they pertain to our argument here. By way of background, the claimant was injured on June 24th of 2007. Her primary employment at that time was a sedentary position as a mistreatment specialist for a company called Computershare, and at the time she was working for the City of Chicago as a traffic control aide. She reports that she was struck by the mirror of a pickup truck. She went to Northwestern Hospital that day, was discharged in stable condition. She states that she followed up with Loyola Hospital the following day and then came under the care, began seeing Mercy Works. In July of 2007, July 6th, the claimant saw Dr. Alexander Gniam, who stated that he noted tenderness, but stated that she had no neurological deficits, recommended therapy, and suggested that she return to him. On July 24th, she saw her family doctor, Dr. Boblik. Dr. Boblik prescribed an MRI. The MRI was completed in August of 2007. The MRI did show two herniated discs at C3-4 and C5-6. How old was the claimant at the time of the accident? 36. That sounds accurate. She was relatively young. I know this case took a while to get to hearing, and by the time it went to hearing, I believe she was in her 40s, but 36 does sound accurate. She was relatively young. Dr. Boblik prescribed the MRI. She had the MRIs. November 4th of 2007, Dr. Boblik states that she can go back to sedentary employment only. She returned to her employment with Computershare on November 5th, 2007, and by her account, worked without any difficulty. She continued working that job until she was laid off on December 7th of 2007, and subsequently, that company closed. On December 21st of 2007, she saw Dr. Nats. Dr. Nats verified on a subsequent date that he provided restrictions of no directing traffic in sedentary employment. In February and March of 2008, the claimant returned to Mercy Works and stated that she was afraid to go back to work directing traffic. Soon after that, March 27th, 2008, Dr. Nats stated that she had permanent restrictions against directing traffic and relegated to sedentary employment. That is the date, well, from that date forward, even accepting the facts in a light most favorable to the claimant, her condition had stabilized. She had reached a state of permanency. The doctor noted that in his opinion, the condition was permanent. In follow-up in April of 2008, Dr. Ghanayem stated that the claimant had permanent restrictions per Dr. Nats, and he accepted that. Dr. Boblik, in continued follow-up notes, repeatedly wrote, permanent restrictions, no directing traffic, sedentary employment. There was at no time relevant to the, from that date forward, was there any indication from the medical records that claimant relies upon and the commission relies upon that there was going to be any change in her physical condition. They all agree that in their view, this condition was permanent. Didn't she have, claimant have PT again? She had it in, I think, 08. In 2010. Yeah, she was treated for a full year by Mercy Works, which is the city's clinic, right? Is that correct? I'm sorry, counsel. Well, she continued to see, oh, I'm sorry, there's sometimes a disconnect between the sound and, so I don't mean to talk over you, but there were visits with Mercy Works and she continued to follow up with Mercy Works, but she wasn't really treating with Mercy Works. They noted her ongoing treatment, but if you look, they prescribed treatment that she wouldn't follow. In fact, at one point, she advised that she claimed her attorney told her she didn't have to do the work hardening that was prescribed. They also prescribed enough functional capacity evaluation that she refused to attend. She was going to Mercy Works, but she wasn't really receiving treatment from them. Again, at no time was there any suggestion in terms of the restrictions that the commission relied upon or any of the treatment beyond that, where anyone suggested that this condition was going to be anything other than permanent. Even when she came under the care of Dr. Prabhu a couple of years later, he recommended physical therapy and he recommended some follow-up, but he never at any point suggested that there was anticipated to be any change in her condition or any abatement of the purported restrictions. I'm sorry, you said delay again. I'm sure you're getting through. Dr. Prabhu thought she was a candidate for surgery, didn't he? Well, he said she may be a surgical candidate. I think realistically what happened there is Dr. Prabhu is a neurosurgeon. Somebody referred her to him and he's evaluating this with fresh eyes and looking and suggesting we could do some additional workup to see if she becomes a surgical candidate. That never happened. Again, there was no suggestion that he ever said she needs surgery or that surgery would do anything to improve her condition. He came under the care of Dr. Prabhu at one point and he recommended or he suggested that it could be a possibility, but he was still investigating that. Shortly after that, the city had her evaluated by Dr. Zelby. Dr. Zelby stated that these restrictions were arbitrary. She didn't need any further treatment and she could go back to work. Of course, she didn't have any more treatment after that date. She did go to PT again, didn't she, in September? In 2010. Yeah, 2010. That round of PT, as I understand it, if I'm reading the records right, she showed improvement in her range of motion. Excuse me. Her range of motion in the shoulder and the strength in her arm. She was still treating all this time. I would not say all this time. She had seen Dr. Prabhu in 2010, so we're talking about three plus years after the date of the accident. Those notes do report or claim improved range of motion, but they never say, there's never any indication that there was going to be any change in the permanent character of her condition. There's never any suggestion that any of this is going to change her condition from being relegated to permanent sedentary employment without an ability to direct traffic. Realistically, as we've submitted in the brief, the claimant has to establish not only that she didn't work, but that she was unable to work. At all times relevant, she has been able to return to her employment as a treatment specialist since November 4, 2007. In fact, she did return to employment as treatment specialist at that time. The only reason she stopped is because she was laid off and the company closed. She never did anything to attempt to find employment outside of that restriction. We would submit that at that point, all the evidence suggests that she was capable of returning to employment at that point. She just didn't. More importantly, when we get to March 27, 2008, when Dr. Nats says that these restrictions are permanent, and every doctor that the commission relied upon thereafter stated that the restrictions were permanent, and the commission in its decision stated these are permanent restrictions, at all times relevant, even in the light most favorable to her, her condition had reached a state of permanency at that point. Her condition had stabilized. What the commission relies upon is that she continued to see a doctor. Seeing a doctor is not the dispositive question. The question is, has the condition stabilized? We would submit that this is, in fact, a question of law because the commission relied upon, certainly the commission has the duty to assess questions of fact. TTD is, in fact, a question of fact. When those questions of fact are based upon an incorrect premise, then it becomes a question of law, according to Natuzak. And as of that date, it became a question of law because the commission is relying simply upon the fact that she continued to see doctors after that date. They completely disregard the fact that their own evidence, what they're relying on, and what they're basing everything in this decision on, is a claim that these are permanent restrictions. And those restrictions became permanent on March 27th, or they're probably permanent before that date, but as far as the record's concerned, they were declared permanent on March 27th, 2008. And unless there's any further questions. No further questions from the court. Thank you, Mr. Zewde. Mr. Clark, you may respond. You're on mute. You're on, yes. Sorry about that. All right. Good afternoon, your honors. Council, may it please the court, Cameron Clark on behalf of the claimant, Veronica Farmer. With regard to the case before your honors this afternoon, I would submit that the commission's decision in all aspects is not against the manifest way to the evidence. Real briefly, as indicated by Mr. Zwick, there were multiple issues disputed at trial and appealed by respondent all the way up through the circuit court that included average weekly wage, medical causation, medical bills, the TTD benefit rates, and it wasn't only until the appellate court review that all of that was forgotten about, so to speak, and only the issue of TTD was placed before this court. With respect to the TTD award, and as I submitted in my brief, there was no additional claim for TTD benefits per se being asked by a petitioner in this claim. What had actually been awarded by the arbitrator and affirmed by the commission was the TTD benefits that the respondent, City of Chicago, voluntarily paid petitioner up through 2010. They acknowledged and accepted the fact that she was still getting treatment, she had work restrictions, and they could not her within a position while she was still on those work restrictions at the City of Chicago. It wasn't until the trial in this matter where the respondent then changed its opinion and was alleging that petitioner should have only been paid six weeks of TTD versus the period of June 25th of 07 to 10-15-2010 based on Dr. Zelby's opinion. Now, again, the arbitrator and the commission summarily dismissed Dr. Zelby's opinion because he was only one out of eight physicians who gave that opinion. With regard to the work release that was given to petitioner in November, there's no dispute on that. Her primary employment was with ComputerShare, and her part-time job was with OEMC at City of Chicago. What respondent continues to sort of not want to acknowledge in this case is that petitioner wasn't hurt working for ComputerShare. ComputerShare had zero obligation to provide her with any type of employment. She got hurt working for the City of Chicago. That's what the commission found. And on top of that, there's no record or no medical evidence that shows that she was released at any point in time, which is what the commission specifically pointed out and was asked of her, of Mr. Zwick, was when was she released to MMI? When did her condition stabilize? Because again, before the commission, they were trying to argue her condition stabilized six weeks post-accident. And Justice Mullen, you're correct. When she was treating with MercyWorks in the early part of March of 08, she continued to go back there in May and in June of 2008, where Dr. Marion had recommended the work conditioning program, continued treatment to follow up with her and to follow up with her physicians. There was never any work release with respect to, hey, she's being released to work because she's MMI. This record is completely void that she was ever released at MMI. Her actual release to MMI date was by Dr. Boblik on May 12, 2011, when he finally discharged her and it's released as to return on an as-needed basis. So she kept getting treatment that entire time. What responded is attempting to argue is that merely because someone was given a permanent work restriction by their treating doctor, that all of a sudden their condition has stabilized. Well, if you follow the respondent's logic in that regard, I would submit that any claimant in this state, that anytime they ever get released to work with a permanent work restriction, but they're still under active medical care, which she was, she was seeing four different physicians at MercyWorks who kept recommending treatment, prescription medications, therapies. The fact that she was given a permanent work restriction doesn't cease the TTD. And again, the city kept paying it because they knew they couldn't accommodate her work restriction. Her being given that permanent work restriction is based on the fact that, yeah, she was hit by a Ford F-150 truck. She had a cervical injury, a lumbar injury, busted out three of her front teeth. She had, Mr. Zwick noted, the two disc herniations at C3, 4, 5, and 6. When she did see Dr. Prabhu, to your point, Justice Mullen, he noted that even at that time, she had current C6 radiculopathy. And you brought up the fact, didn't she get improvement from the therapy that she had had in 2010? She did. And what the respondent has conveniently left out of this appeal is that one of their underlying denials on the medical bill from ATI, which was $9,000. Because at that point in time, they ran it through utilization review and they didn't want to award the therapy for her. And both the arbitrator and the commission noted that her condition hadn't stabilized and that she did see improvement by going to the additional therapy, which is why they awarded the medical bill from ATI. But that's all sort of been swept aside. And they just want to rely on this argument of, oh, she has a permanent restriction. Well, again, I would submit to this court, if an ironworker falls tomorrow and he ends up at the hospital and he has a tragic injury and he's paralyzed and the doctor says, hey, you know what? You're permanently restricted from being an ironworker. Well, obviously that would make sense. But that person's still getting treatment. The fact that the doctor went ahead and assigned a restriction that they said, hey, we know right now this is going to be a permanent restriction for sure. She wasn't discharged. That's the key. She was never discharged from medical care in this case. Never the city doctors never gave an MMI opinion. And again, Dr. Boblett didn't give that opinion for years later. So respondent is, you know, and again, in a acknowledge the fact that payment of compensation is not an admission of liability, but this wasn't even an issue until the trial date on this case. So Mr. Zwick did not handle this case originally for the respondent. It was handled by the city's in-house attorneys for all the years up until the last year's prior to the case actually proceeding to hearing. But again, there was never an issue on this. And in fact, as pointed out in the decision, the city never even paid her her concurrent average weekly wage. That was a part of the award. They never disputed that she had the primary employment, but even with the TTD, they were paying her based off of her average weekly wage with OEMC of like 300 and some odd dollars, not her concurrent average weekly wage. But again, it wasn't the fact that computer share shut down and they're trying to argue, oh, she could have went back to work or she should have. She wasn't released from care. There is literally no medical evidence that shows that her condition stabilized. And as pointed out, or I should say is with respect to the commission decision, they did modify the arbitrator because they found that the arbitrator had actually, there was a scrivener's error, but they also awarded her temporary partial disability benefits while she was at computer share. And then after that, they said the TTD kicks back in because she got laid off to no fault of her own. The company went out of business. And let's all remember what happened at the end of 07-08. We had our subprime lending crisis where millions of people lost their jobs and their houses. So to argue, oh, she's highly employable. She can go into this field. There was a substantial issue going on in this country at that point in time. But that aside, she wasn't discharged from care. Yeah, she had a permanent restriction. Absolutely nobody denies that, but her condition had not stabilized. And there wasn't one, again, one single doctor. The only doctor out of the eight who said it was Dr. Zellbe in 2010, who said she only had a back strain and could work full duty after six weeks. So I would request that the commission of the decision be affirmed, and that it's not only not against the manifest way of the evidence, it's not contrary to law. Any questions from the court? No? No? Thank you, Mr. Clark. Mr. Zwick, you may reply. Thank you, Your Honor. Okay. I have a very serious problem with counsel talking about what was discussed before the trial and when this issue was raised, because there were also all sorts of self-discussion that I would love to have part of this record, and it's not. All that is speculative, and I don't think it's proper to talk about what was discussed prior to this hearing, because I dispute what counsel said in that regard. And as he noted, payment of benefits is not an admission of liability, and he knows that. And what realistically happened in this case is we had an adjuster who didn't understand that or didn't realize that she had concurrent employment at the time and was paying based off of the city of Chicago case. And we know she probably didn't realize that the claimant had gone back to work in November of 2007 because those benefits continued during that time. Had she been aware, she would have likely terminated benefits at that time. In terms of this notion, and then counsel said, you know, the question is, could have or should have gone back to work at Computershare in that level of employment. The fact of the matter is she did go back to that level of employment and worked it without any problem. And then once the benefits, once Dr. Zelby provided his opinions, her testimony was that she was able to secure employment with no problem. She, you know, first had a temporary job, but then secured a job at Northern Trust without any difficulty. So the record demonstrates that during this entire period of time, she was fully capable of returning to employment. And when she made the effort, she did go back to employment. Excuse me, isn't it? She didn't see Dr. Zelby until September of 2010. Correct. The injury was in June of 07. Correct. I, you know, I guess just a concern. You say it's a matter of law, but really, I mean, in terms of what she was capable of, what was MMI? Those are really fact questions. And the way to be given to Dr. Zelby's report, the, correct me if I'm wrong, but I think the arbitrator said that brief return to work within a restrictions in November of 07, I think it was, was irrelevant. How do we reverse that fact finding? Well, it's, I mean, I would say that is again, based upon an incorrect premise that, because the court has sat under in Holicker and the coast, you know, that these, the dispositive questions are, has the claimant reached a state of permanency or has the condition stabilized? And is she capable of returning to and at all times relevant, those answers are in the affirmative, even looking at the, this in a light, most favorable to claim it, because we can't talk about Dr. Zelby. I mean, I, you know, I, I agree that, you know, his, I believe he's correct. These restrictions appear permanent. She didn't do work hardening. She didn't undergo functional capacity evaluation, but for the employer, unfortunately that ship has sailed. The, the, the restrictions are deemed permanent. They were deemed permanent as of March 27, 2008, and nothing at any time in a light, most favorable to the claimant was ever expected to change regardless of the, of the ongoing visits with the doctor. And yes, she reported some improvement in range of motion. And yes, continued to receive treatment. But when, you know, people have ongoing treatment for conditions that aren't going to improve all the time, that's what palliative care is. If somebody's in a hospice, they're, they still see a doctor. That doesn't mean they're going to improve. They're getting palliative care or maintenance. Realistically, I think what was going on was she was seeing the doctor to continue the benefits. Now, real quickly with regard to the whole issue of seeing, or I'm sorry, of receiving benefits. Yes, she was paid mistakenly based on her wage at the city only because the adjuster, the individual who was incorrectly making that decision was unaware of the concurrent employment. Her department was aware of it, but the claimant never communicated that to the adjuster. The department never communicated that to the adjuster. No one ever communicated that to the claimant in terms of what was needed. And council also said, you know, talking about the iron worker example, et cetera, et cetera. If we're going to get into those kinds of benefits, council had ample opportunity to submit a demand for vocational rehabilitation, and we could have explored all those issues, but that was never done. What all we're looking at here is when did her condition stabilize? And what's the proper and allowable period of TTD? Thank you. Any questions for Mr. Zwick from the court? Okay. Thank you, council, both for your arguments on this matter this afternoon. It'll be taken under advisement. A written disposition shall issue.